## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 24 2019, 6:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: G.T., T.H., M.H., and M.C., Children in Need of Services, | July 24, 2019 |
| and | Court of Appeals Case No. 19A-JC-219 |
| A.C. (Mother), | Appeal from the Wabash Circuit Court |
| *Appellant-Petitioner,* | The Honorable Robert R. McCallen, Judge |
| v. | Trial Court Cause No. 85C01-1808-JC-46 |
| The Indiana Department of Child Services, | 85C01-1808-JC-47 85C01-1808-JC-48 85C01-1808-JC-49 |
| *Appellee-Respondent.* | |

**Tavitas, Judge.**

## Case Summary

[1] A.C. ("Mother") appeals the trial court's order adjudicating Mother's four minor children, G.T., T.H., M.H., and M.C. (collectively, the "Children") as Children in Need of Services ("CHINS"). We affirm.

## Issue

[2] Mother raises one issue, which we restate as whether the evidence is sufficient to adjudicate the Children as CHINS.

## Facts

[3] Mother has five children. The four Children at issue in this appeal are G.T., born in December 2003, T.H., born in May 2006, M.H., born in December 2007, and M.C., born in August 2014.[1] Mother's oldest child, B.T., is an adult and has a child of her own. On August 15, 2018, a school day, during school hours, the Wabash County Department of Child Services ("DCS") received two reports alleging potential neglect of the Children. The nature of the reports were that the Children were observed wandering around without an adult in

---

[1] G.T.'s father is C.C., with whom G.T. was placed during the CHINS proceeding. C.C. did not appear for the fact finding hearing. T.H. and M.H.'s father is J.H., who was not involved in the CHINS proceedings. M.C.'s father is B.P., who was not involved in the CHINS proceedings. Accordingly, the trial court only addressed issues with respect to Mother during the fact finding hearing.

downtown Wabash, Indiana, going into local businesses to ask for food, and spending significant amounts of time in different downtown establishments.

[4] Julie Hobbs, the DCS local office director, located the Children at the downtown library, and both Hobbs and DCS Family Case Manager ("FCM") Joseph Townsend went to the library to talk with the Children. When FCM Townsend first saw the Children in the library, they were "pretty dirty," "smell[y]," and "unkempt."[2] Tr. Vol. II p. 38. Mother arrived at the library a short time after Hobbs began speaking with the Children, and Mother was "completely uncooperative." *Id.* at 39. Law enforcement arrived to assist Hobbs and FCM Townsend at the library. Mother's parents ("Grandmother" and "Grandfather") also arrived at the library.

[5] The Children indicated to FCM Townsend that they were walking to a location approximately two miles away; however, it was raining outside, and the Children did not have any rain gear. The Children told FCM Townsend that Mother was in Kokomo to renovate a house and was expected to be in Kokomo for a couple days. FCM Townsend later learned, however, that Mother was dealing with a death in the family in Fort Wayne that day. The Children shared a cell phone, which they used to call Mother, and Mother could track the Children's location using the cell phone. FCM Townsend testified at the CHINS fact finding hearing that the Children had been regularly left alone

---

[2] Mother later testified that she was made aware of the "strong urine smell" in the Children's clothing, which she was later able to remove. Tr. Vol. II p. 116.

without adult supervision for approximately two weeks prior to the August 15, 2018 report date, and it was "virtually an everyday thing." *Id.* at 53.

[6] When the Children and Mother were brought back to the DCS office, the Children were "wild," and unruly. *Id.* at 38. FCM Townsend notified Mother that DCS would be removing the Children, Mother was "completely uncooperative," and was "extremely upset [with FCM Townsend], yelling at [him], cussing at [him]. . . ." *Id.* at 39. Mother threatened all those involved "with [their] jobs." *Id.* at 57-58. Finally, Mother told the Children something to the effect of "go ahead and act up and make [DCS] want to take you back." *Id.* at 58.

[7] In the course of his investigation, FCM Townsend found six prior substantiated DCS cases involving the family alleging lack of supervision and neglect and the fact that T.H. was born with THC in his system. In one instance, M.C. was lifted over a fence in order to let all of the Children into a playground "which got vandalized;" the Children were "breaking limbs off neighbors' branches," "antagonizing their dogs," and playing in a public fountain. *Id.* at 37. Law enforcement was involved in each of those incidents with the Children and notified Mother regarding the incidents. FCM Townsend felt removal was necessary because the Children were out in downtown Wabash alone. FCM

Townsend did not believe that fourteen-year-old G.T. was capable of monitoring the other Children. [3]

[8] On August 17, 2018, DCS filed a petition alleging the Children to be CHINS. [4] The petition alleged the Children were CHINS based on Mother's inability, refusal, or neglect under Indiana Code Section 31-34-1-1, and Mother's violation of "The Compulsory School Attendance Law"—codified in Indiana Code Section 20-33-2-6—resulting in educational neglect. The petition also alleged that Mother has "a very extensive history of DCS and law enforcement involvement," including "36 separate abuse/neglect reports, 25 abuse/neglect assessments, and 4 DCS cases." Appellant's App. Vol. II p. 134. [5]

[9] At an initial hearing on August 17, 2018, the trial court found it was in all of the Children's best interests to be removed from Mother's home during the pendency of the CHINS action. G.T. was placed with his father; M.H. and T.H. were placed in foster care in Cass County; and M.C. was placed in foster care in Wabash. FCM Townsend testified that M.C. appeared to have a

---

[3] FCM Townsend also testified at the hearing that the Children were CHINS because M.H. is autistic and is on medications and requires services as a result, and M.C. needs additional schooling to "encourage her." Tr. Vol. II p. 52. We address these arguments only because Mother raises them in her brief; however, we do not believe these alone would require a CHINS finding. Regardless, FCM Townsend conceded that there was no evidence Mother ever failed to listen to a doctor's direction with regard to the Children.

[4] DCS filed one petition as to G.T., a second petition as to T.H. and M.H., and a third petition as to M.C. The petitions are substantially similar.

[5] We cite this allegation from G.T.'s petition; however, all of the petitions allege the same information.

communication delay; however, since her placement, M.C. appears to be doing well.

[10] A fact finding hearing occurred on December 11, 2018. Liz Hobbs ("Liz"), the Director of Access Youth Center ("Access"), testified regarding her interactions with the Children on August 15, 2018, which was the basis for one of the reports regarding the Children. Access is a program center that provides "safe, consistent place for kids in [the] community to come . . . through a variety of different programs." Tr. Vol. II p. 82. Liz testified that the Children participate in the afternoon program at Access. At 1:30 p.m. on August 15, 2018, M.H. appeared at Access with M.C. Liz asked M.H. why he was not in school, and M.H. reported that he missed the bus. M.H. told Liz he could not get to school because he did not know how to walk to school and because he had to babysit M.C. Liz told M.H. to come back at 3:45 p.m. when the after school program—which the Children participated in—began. All four Children returned to Access at 2:45 p.m., and again, they were told to return at 3:45 p.m.

[11] G.T. revealed to Liz that Mother was out of town the day of August 15, 2018, the Children were alone, and G.T. was unsure when Mother would return. The Children told Liz that they were walking to an apartment complex approximately two miles away to the home of Mother's friend where they would eat that night. The Children also expressed some uncertainty as to whether they would be alone overnight.

[12] Laura Sigler, the assistant principal at Wabash Middle School, also testified that, from 2017-2018, G.T. was enrolled for part of the school year, and T.H. was enrolled for the entire school year. During the 2017-2018 school year, G.T. withdrew in November 2017 and did not complete the school year. At the time of the fact finding hearing, G.T. had re-enrolled in school on August 14, 2018 for the 2018-2019 school year, even though he had not completed the 2017-2018 school year. T.H. completed the 2017-2018 school year, but was not enrolled for the 2018-2019 school year.

[13] G.T. went to the school to re-enroll himself for the 2018-2019 school year sometime between August 9 and 10, 2018. When G.T. went to the school, Mother did not come with G.T. to enroll him initially, so the school declined to enroll G.T. on his own; however, eventually Mother called and asked the school to enroll G.T. On August 14, 2018—the day before DCS received reports regarding the Children—G.T. was re-enrolled for the school year.

[14] Within hours of G.T.'s enrollment on August 14, 2018, Mother came to the school and told G.T. that his "place is at home," because Mother needed help "cleaning the house, [and] getting ready to move." *Id.* at 99. Mother indicated interest in enrolling G.T. in a home school program; however, Sigler concluded that the online program did not work out because G.T. returned to school a few weeks later. Sigler testified that G.T. missed six and one half days of school while he was enrolled, not counting the days he came to school late. Finally, Sigler testified that approximately five times she had to wash clothes for G.T.

when he was in fifth and sixth grades, but she has not "had to wash any clothes for him [in the 2018-2019] school year." *Id.* at 102.

[15] Marcus Szeibel, who works at Madoc's Market ("Madoc's") in downtown Wabash, testified that the Children began coming in regularly at the beginning of the summer of 2018 and, as the summer went on, the frequency of the visits also increased. Some days the Children would "come in and stay for eight or ten hours a day." *Id.* at 63. Szeibel also indicated that the Children appeared to be dirty and unkempt. Szeibel never spoke with the Children's parents, however, he received a "passionate phone call" from Mother, informing Szeibel that everyone at Madoc's "needed to stop interacting with the [C]hildren." *Id.* at 64. Mother warned, "[w]ith expletives," that the employees needed to stop interacting with the Children or Mother would get the police involved. *Id.* at 65. The Children stopped visiting the restaurant a few days after Mother's phone call, but eventually began visiting again.

[16] Monique Rodriquez, another Madoc's employee, interacted with the Children often during the summer of 2018. The Children began asking Rodriquez for free food. Rodriquez also set up a gift card for the Children where she, the owner, and other people in the community would contribute money toward food for the Children. If Rodriquez did not have any money to put toward the gift card, Rodriquez would go to her home—which was above the restaurant— and cook for the Children there. Rodriquez would also question the Children regarding their appearance, asking the Children if they bathed recently.

[17] Rodriquez testified that she also took the Children to the museum one day and that, while at the museum, the two oldest Children argued over whose turn it was to watch M.C. Rodriquez testified that she could not communicate with M.C., and the other children had to essentially translate what M.C. was saying because M.C. "appeared underdeveloped," and basically spoke "gibberish." *Id.* at 77. Despite all this time Rodriquez spent with the Children, Rodriquez stated that her first time seeing Mother was the day of the CHINS fact finding hearing. Approximately two weeks after the Children were removed from Mother, G.T. visited the restaurant and gave Rodriquez a silver pocket watch as a thank you for helping the Children. Rodriquez did not recognize G.T. initially because he was clean and had a haircut.

[18] Mother testified at the fact finding hearing that she was working on her house in Kokomo to make it habitable. Mother also testified that she home schools the children as an "alternative."[6] *Id.* at 106. When asked the types of materials she uses for home schooling, Mother testified:

> That varies from year to year because there's no State guidelines
> or curriculum that I have to follow. It's basically what I see fit,
> what I think the schools are lacking. Um, so I go by what
> they've been learning and what I think that they should have
> been learning, also. Um, like they don't teach kids to write

---

[6] The exact time line of the Children's home schooling is not exactly clear from the hearing. It appears that some of the Children were home schooled at different periods of time, as Sigler testified that G.T. was only unenrolled for a few weeks some time ago. Mother was clear, however, that she only planned to home school the children for the one year to ease the Children's transition to Kokomo.

cursive anymore, or how to read a walk log, or how to read a
newspaper, or things like that . . .

*Id.* Mother testified that she has never left her Children home alone overnight,
but there were a few occasions where Mother had an emergency and a neighbor
had to watch the Children.

[19]  Mother also stated that the reason she called Madoc's was because she "found
inappropriate text messages" between G.T. and Rodriquez, which seemed to be
"flirtatious" and these messages "enraged" Mother. *Id.* at 124. Finally, Mother
testified that G.T. has issues with telling the truth, and Mother relied on G.T.
and T.H. to "watch each other." *Id.* at 127.

[20]  At the time of the fact finding hearing, FCM Townsend classified Mother's
home in Kokomo as a "construction site," in that there were still
"approximately ten sheets of drywall yet to hang," and "there was floor
covering that needed done." *Id.* at 41. Mother's home had electricity, running
water, and heat. Mother further testified that her sources of income are:
"woodworking on the side," "breed[ing] dogs twice a year," and other "odds
and end jobs on the side." *Id.* at 111.

[21]  Grandmother also testified that she and Grandfather offered to take the
Children when they were removed from Mother; however, Grandmother was
unable to take G.T. for visits with Mother three times weekly because
Grandmother lives out of town. Accordingly, DCS could not place the
Children with Grandmother and Grandfather. B.T., Mother's adult child,

testified similarly that the Children could not be placed with B.T. because she also could not meet the visitation requirements due to lack of transportation. B.T. also has one substantiated case involving DCS with her own child.

[22] On December 13, 2018, the trial court entered findings of fact and conclusions of law and adjudicated the Children as CHINS. In part, the trial court found:

\* \* \* \* \*

> Petitions alleging the children are Children in Need of Services (CHINS) were filed on August 17, 2018, after an investigation by DCS that began on or about August 15, 2018. On that day, DCS received multiple reports that the children were observed wandering around downtown Wabash, Indiana, without any adult supervision. After a brief search by DCS and local law enforcement, the children were located at approximately 5:45 p.m. at the public library which is approximately one block from downtown Wabash. The children appeared extremely dirty. [] They were taken to the local DCS office, where they were very disruptive and unruly.

\* \* \* \* \*

> There is no question [Mother] loves her children and her children love her. Sadly, despite such love, she is neglectful of both her children's need for supervision and education. If [Mother] would only appreciate how her actions are seriously impairing the mental and emotional development of her children, there would be no need for the Court's intervention. She doesn't. Her neglect seriously impairs the children's mental, emotional and educational needs.

\* \* \* \* \*

> The children are children in need of services as alleged in the
> Petitions on file herein.

Appellant's App. Vol. II pp. 43-45.

[23] The trial court held a dispositional hearing on January 18, 2019, and entered a dispositional order on January 25, 2019. The dispositional order required Mother, among other things to: (1) maintain communication with the FCM; (2) participate in all programs recommended by the FCM; (3) maintain suitable, safe and stable housing; (4) secure and maintain a legal and stable source of income; (5) ensure that the Children are properly clothed, fed, and supervised; and (6) ensure that the Children are attending school, if age appropriate. Mother now appeals.

## Analysis

[24] Mother argues that the evidence is insufficient to conclude that the Children are CHINS. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *N.L. v. Ind. Dep't of Child Servs* (*In re N.E.*), 919 N.E.2d 102, 106 (Ind. 2010). On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* Here, the trial court entered findings of fact and conclusions of law in granting DCS's CHINS petitions. When reviewing findings of fact and conclusions of law, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.,* 934

N.E.2d 1127, 1132 (Ind. 2010). We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[25] Indiana Code Section 31-34-1-1 provides that:

> . . . [A] child is a child in need of services if, before the child becomes eighteen years of age:

>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

>> (2) the child needs care, treatment, or rehabilitation that:

>>> (A) the child is not receiving; and

>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[26] "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *In re N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105. "A CHINS adjudication focuses on the condition of the

child . . . . [T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id*. (citations omitted).

[27]     Mother concedes that the Children are under the age of eighteen and that she is the natural mother of all four children. Mother argues, however, that DCS failed to prove all other requirements of the CHINS statute, namely, Indiana Code Section 31-34-1-1(1) and (2). The CHINS statute is written in the conjunctive; therefore, DCS must prove all the elements by a preponderance of the evidence. Ind. Code § 31-34-12-3.

## *A. Indiana Code Section 31-34-1-1(1)*

[28]     The first section of Indiana Code Section 31-34-1-1(1) provides that DCS must prove:

> the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; . . . .

Mother argues that DCS did not prove this portion of the statute because "there was no testimony provided during the Fact-Finding Hearing that demonstrated particular facts that the Children's physical or mental condition was being *seriously* impaired and/or *seriously* endangered. . . ." Appellant's Br. p. 16 (emphasis supplied). Moreover, Mother argues that "DCS failed to present any evidence that the Children were seriously harmed in anyway, either physically, mentally, sexually, or other, by her supposed neglect," and that DCS failed to

"demonstrate any evidence that the Children were academically behind when they restarted their formal education process." *Id.* at 25.

[29] With regard to the Children's educational needs, the trial court found that Mother's home schooling is a "charade." Appellant's App. Vol. II p. 44. The evidence supports this conclusion. When pressed on cross-examination about the type of education Mother is providing to Children, Mother testified:

> Q. What did the — What did the typical schedule look like on an average day?
>
> A. Well, when I wake up, I hit the floor running and we don't stop.
>
> \* \* \* \* \*
>
> Q. Where's the education in that?
>
> A. Everywhere. [M.H] goes to the grocery store with me and he's organizing everything into his little blocks. And he can calculate, and bargain shop, and organize, and all kinds of different things.
>
> Q. So what does the actual schedule look like?
>
> A. It just depends on the day.
>
> \* \* \* \* \*
>
> Q. How much of this nontraditional curriculum are you teaching your kids most days?

A. There isn't any set curriculum or set, um, scheduling.

Q. Now that's not entirely true is it?

A. What do you mean?

Q. In fact, Indiana law requires a hundred and eighty days of education a year for each kid, correct?

A. We go every day.  We go —

Q. Going to the store qualifies?

A. We learn something every day.

Q. Okay.  But you can't give me a schedule, a time, anything specific about what that looks like?

A. There's no certain set hours in the curriculum or in curriculum that says I have to follow, just that I have to keep track.  And if I do every day, then what is there that I need to write down?

Tr. Vol. II pp. 118-119.  In earlier testimony, Mother also attempted to explain how T.H. learned something every day because, for example, he "knows how to work a reciprocating saw." *Id.* at 118.  The trial court found that the evidence demonstrated that Mother "lacks appreciation" for the importance of the Children's education and that, accordingly, Mother's "neglect seriously impairs the children's mental, emotional and educational needs." Appellant's App. Vol. II p. 45.

[30] Mother argues that the evidence was insufficient to find that Mother did not adequately educate the Children because M.H. testified regarding the books and projects that the Children complete. Mother testified she has a home school registration number, and that Mother "involves the Children in her everyday activities like grocery shopping." Appellant's Br. p. 21. Mother's argument is simply an invitation for us to reweigh the evidence, which we cannot do. *See N.L.,* 919 N.E.2d at 106.

[31] With regard to Mother's supervision of the Children, the trial court found that, despite Mother's arguments that the Children are either always under her supervision physically or by cell phone, "the evidence showed otherwise." Appellant's App. Vol. II p. 45. The trial court also concluded that these actions seriously impaired the Children's mental and emotional needs. We agree with this conclusion. The evidence demonstrates that the Children were regularly alone, at least in the weeks leading up to the date of their removal. Mother was often in Kokomo to work on renovations to her home. Fourteen-year-old G.T. was left with the responsibility of caring for the other Children. The trial court also acknowledged, based on Mother's testimony, that G.T. has difficulty with telling the truth; however, Mother still regularly left the Children in G.T.'s care. The evidence also indicated that, when the Children were found, they were dirty.

[32] Mother argues that this evidence is insufficient because it only demonstrates the Children were behaving in activities that Children typically do in the summer: "swimming, skating, hanging out and being normal children." Appellant's Br.

p. 25. Mother also contends that, even FCM Townsend pointed out that, to his knowledge, no one in the community ever complained to Mother about the Children being in their establishments. Mother argues that "Wabash is a very small rural community where just about everybody knows everybody and the community looks out for each other," and "[a]s the saying goes, it takes a village and in this case, the village responded and helped Mother with the Children." *Id.* Mother essentially invites us to reweigh the evidence and conclude that the evidence does not demonstrate Mother's neglect, but instead that the Children were just behaving as children do in a small, tightknit community. We will not reweigh the evidence to reach this conclusion.

[33] The evidence was sufficient to conclude that Mother's lack of supervision and failure to provide education for the Children seriously impaired the Children's physical or mental condition.

### B. Indiana Code Section 31-34-1-1(2)

[34] The second section of Indiana Code Section 31-34-1-1(2) states that DCS must prove:

> the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

This element "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs.'" *In re D.J. v. Indiana Dept. of Child Services,* 68 N.E.3d 574, 580 (Ind. 2017) (quoting *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014)) (emphasis supplied). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *D.J.,* 68 N.E.3d at 580 (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[35] Mother "disputes that it will take the coercive intervention of the trial court to force her to meet the Children's needs as she is already meeting and exceeding those needs." Appellant's Br. p. 26. We reject Mother's argument for two reasons. First, Mother's argument on this requirement of the CHINS statute seems to rest on the conclusion that Mother was already meeting and exceeding the Children's needs. We have already rejected this premise above; therefore, Mother's argument on this point fails.

[36] Also, we reject Mother's argument for a second reason. The trial court concluded: "If [Mother] would only appreciate how her actions are seriously impairing the mental and emotional development of her children, there would be no need for the Court's intervention." Appellant's App. Vol. II p. 45. We agree with the trial court that Mother's testimony demonstrates that she does not believe she needs to change her conduct.

Moreover, DCS testified that Mother was difficult to work with in this process. Accordingly, the evidence was sufficient to support the trial court's conclusion that Court intervention was needed in order to provide necessary assistance to the Children.

## Conclusion

The evidence is sufficient to prove that the Children are CHINS. We affirm.

Affirmed.

Crone, J., and Bradford, J., concur.